IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| LIVING BENEFITS ASSET MANAGEMENT, LLC, | § § § | |
| Appellant, | § § § | |
| v. | § | Civil Action No. 4:17-cv-00486-O |
| KESTREL AIRCRAFT COMPANY, INC., | § § § § | |
| Appellee. | § § | |

## MEMORANDUM OPINION and ORDER

Before the Court is Appellant Living Benefits Asset Management, LLC's ("LBAM") Brief (ECF No. 8), filed September 2, 2017; Appellee Kestrel Aircraft Company, Inc.'s ("Kestrel") Brief (ECF No. 11), filed October 2, 2017; and Appellant's Reply (ECF No. 12), filed October 17, 2017. This action is before the Court on appeal from of an order of the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division. After considering the motion, briefing, the record on appeal and relevant law, the Court **DENIES** the appeal and holds that the bankruptcy court's order should be and is hereby **AFFIRMED**.

## I. JURISDICTION

This appeal is from the bankruptcy court's March 9, 2017 oral ruling and March 23, 2017 final judgment order—incorporating its prior findings in the oral ruling. The order held that, while Kestrel breached its contract with LBAM, LBAM was not entitled to recover on the contract because it failed to register under the Investment Advisors Act of 1940 ("IAA") and therefore the contract is voidable under the IAA. This Court has jurisdiction pursuant to 28 U.S.C. § 158(a).

## II. UNDERLYING PROCEEDINGS

Before filing for bankruptcy, Appellant LBAM contracted with Appellee Kestrel, to provide independent consulting services in connection with Kestrel's attempt to raise $135 million in capital to pay for a prototype airplane, the terms of which the parties detailed in an Engagement Letter, dated August 29, 2013 (the "Engagement Letter"). Bankr. R. 2255–77, ECF No. 6-8.[1] Kestrel engaged LBAM for its knowledge and expertise in developing a life settlement-driven investment vehicle. The Engagement Letter required LBAM to advise Kestrel on how life settlements could be structured as collateral as part of Kestrel's attempt to raise the capital to fund their venture. Bankr. R. 1085, 1552, 1560, 1565, ECF No. 6-3 In return, Kestrel agreed to pay LBAM a flat fee of $950,000.00 (the "flat fee"). Bankr. R. 2258, ECF No. 6-8.

The Engagement Letter required LBAM to advise Kestrel on how it could invest in life settlements as a means of providing a collateral hedge for investors. LBAM also modeled a hypothetical portfolio of life settlements for Kestrel to help Kestrel understand how life settlements worked—the costs involved, when policies matured, and what kind of cash flow life settlements provided. Bankr. R. 1043, 1098–99, ECF No. 6-3. Kestrel used the model at its investor presentations. LBAM also prepared a Confidential Information Memorandum (the "CIM") that stated that acquiring settlements would generate for Kestrel in excess of $85 million out of $100 million of insurance during 10-year term of investment. Bankr. R. 3076, ECF No. 6-12. Kestrel used this CIM at potential investors meetings, usually with an LBAM employee present to answer technical questions if necessary. The CIM described the potential investment in Kestrel and how the life settlement portfolio would act as part of the security against the debt facility to be obtained in order to fund Kestrel's plans. The life settlement portfolio would provide principal protection

---

[1] References to the bankruptcy record will be to the page number at the bottom of the page, referring to the record as a whole. The ECF number will refer to the numbered appendix in which the page is contained. For example, this cite refers to page 2255 of the record, contained in Appendix 8 of the record.

to the investors; the CIM predicted high figure returns over a 10-year period from these portfolios. Barnkr. R. 3062, ECF No. 6-12.

The Engagement Letter required Kestrel to purchase life settlements from LBAM only, for two years after signing the contract. Bankr. R. 2257, ECF No. 6-8. Under this arrangement, the Engagement Letter contained a draft Origination Agreement to use as a contract between the parties in the event of future life settlement purchases. Bankr. R. 1375, 1591 ECF No. 6-3. While the Origination Agreement was not a contract, it was attached to the Engagement Letter and mentioned within the contract. Bankr. R. 2257, ECF No. 6-8. The Origination Agreement generally provided that, upon request by Kestrel, LBAM would locate entire life settlement policies, which met a set of criteria established by Kestrel, for purchase by Kestrel. *Id.* at 2263–65. The terms of the Origination Agreement also gave Kestrel a substantial amount of managerial control over any potential purchase of life settlements. *Id.* The Origination Agreement also required LBAM to provide additional services if Kestrel raised sufficient capital from life settlement purchases. But as Kestrel did not raise the capital, the Origination Agreement was never signed or used by the parties.

On November 16, 2015, LBAM filed a voluntary petition for bankruptcy relief under chapter 11 of title 11 of the United States Bankruptcy Code. On December 16, 2016, LBAM commenced adversarial proceedings against Kestrel in the bankruptcy court, arguing that LBAM had provided all the services required by Kestrel according to the Engagement Letter, and that Kestrel breached the Engagement Letter by only paying LBAM a portion of the contractual flat fee. Bankr. R. 19, ECF No. 6-1. Kestrel countered that the contract was covered under the Investment Advisors Act of 1940, 15 U.S.C. § 80b-1 *et seq.* (the "IAA"), and that because LBAM had not registered under the act, the contract was voidable. The bankruptcy court conducted a trial

from January 30, 2017, to February 1, 2017. Bankr. R. 34, ECF No. 6-1. On March 9, 2017, the bankruptcy court entered an oral ruling with findings of facts and conclusions of law. *Id.* at 34. The bankruptcy court found that while Kestrel breached the Engagement Letter, LBAM could not recover because it failed to register under the IAA, making the contract voidable. *Id.* at 1053.

The bankruptcy court first addressed whether life settlements were securities for the purposes of the IAA. Bankr. R. 1121, ECF No. 6-3. It utilized the Supreme Court's test in *Securities & Exchange Commission v. W.J. Howey Co.*, 328 US 293 (1946) for defining securities under the Securities Act of 1934, namely, that "an investment contract is a security if the investor, one, expects profits;[2] two, from a common enterprise that; three, depends solely on the efforts of others." Bankr. R. 1121, ECF No. 6-3. It found that the first prong was satisfied with no analysis. *Id.* ("We won't dwell on the first prong. Clearly, Kestrel expected profits from the life settlements."). The bankruptcy court then analyzed the third prong, whether profits are derived solely from the efforts of others. Applying the rule in *Long v. Shultz Cattle Company*, 881 F.2d 129 (5th Cir. 1989), noting that "substantive economic realities must govern over form," the bankruptcy court noted that the critical inquiry is whether the efforts made by those other than the investor are the undeniably significant ones—"those essential managerial efforts which affect the failure or success of the enterprise." Bankr. R. 1122, ECF No. 6-3. The court found that the efforts of Kestrel heavily depended on LBAM's expertise, and while the duties imposed on Kestrel were significant the success of the proposed investments in life settlements depended on LBAM. Accordingly, the court found that the third prong of *Howey* was satisfied. *Id.* at 1123.

The bankruptcy court then considered the second prong, whether there was a common enterprise. The bankruptcy court applied the Fifth Circuit's broad vertical test in *Long*. The Fifth

---

[2] This is a misstatement of the test. The *Howey* test requires (1) an investment of money in (2) a common enterprise, (2) with the expectation of profits solely from the efforts of others. *Howey*, 328 U.S. at 301

Circuit requires an inquiry into whether the fortuity of the investments is essentially dependent upon promoter expertise. *Long*, 881 F.2d at 134. While there must be interdependence between the investor and the promoter—that interdependence may be shown by the investor's reliance on the promoter's expertise, regardless of whether the promoter receives only a flat fee or a commission. *Id.* at 1124–25. The bankruptcy court found that the second prong was satisfied. *Id.*

Then, regarding the IAA, it found that the evidence established, at the very least, LBAM was in the business of advising others, including Kestrel, as to the advisability of investing in life settlements. *Id*. "There's no way to look at Defendant's Exhibit 1 and the Origination Agreement and conclude that LBAM was not an investment advisor as to life settlements within the meaning of 15 U.S.C. § 80b-2(a)(11)." *Id.* at 1126.

The bankruptcy court finally addressed LBAM's motion to exclude all parol evidence from the proceedings. It admitted that it used parol evidence in reaching the above findings, namely testimony and email communications leading up to and after the execution of the contract. It found, however, that consideration of parol evidence did not prejudice LBAM. *Id.* at 1129.

On March 23, 2017, the bankruptcy court entered final judgment, and LBAM filed a motion for a new trial, or alternatively a motion to alter the judgment, which the bankruptcy court denied. *Id.* at 1801. LBAM now appeals the bankruptcy court's final judgment. *Id*. at 1–3.

### III. ISSUES ON APPEAL

The three issues Appellant presents on appeal are:

1. Did the Bankruptcy Court err in determining that Appellant was required to register as an investment advisor under the Investment Advisors Act of 1940?

2. Did the Bankruptcy Court err in determining that a portfolio of life settlements constituted securities under the Investment Advisors Act according to the federal test?

3. Did the Bankruptcy Court err in relying on parol evidence to vary the terms of any contract or potential contract between Appellee and Appellant?

Appellant's Br. 2, ECF No. 8.

## IV. STANDARD OF REVIEW

When a district court reviews a bankruptcy court's decision, it functions as an appellate court and utilizes the same standard of review generally applied by a federal court of appeals. *In re Webb*, 954 F.2d 1102, 1104 (5th Cir.1992). In reviewing conclusions of law on appeal, a *de novo* standard of review is applied. *In re Coutee*, 984 F.2d 138, 140 (5th Cir. 1993); *In re Young*, 995 F.2d 547, 548 (5th Cir.1993); *In re Allison*, 960 F.2d 481, 483 (5th Cir. 1992). A bankruptcy court's findings of fact are subject to the clearly erroneous standard of review. *Young*, 995 F.2d at 548; *Allison*, 960 F.2d at 483. These findings are reversed only if, based on the entire evidence, the court is left "with the definite and firm conviction that a mistake has been made." *Id*.

## V. ANALYSIS

### A. Registration under the IAA

The Court will first determine whether LBAM qualifies as an investment advisor under the IAA. The IAA makes it "unlawful for any investment advisor, unless registered under this section, to make use of the mails or any means or instrumentality of interstate commerce in connection

with his or its business as an investment advisor." 15 U.S.C. § 80b-3.[3] The IAA defines an "investment advisor" as any person who,

> for *compensation*, engages *in the business of advising others*, either directly or through publications or writings, *as to the value of securities* or *as to the advisability of investing in, purchasing, or selling securities*, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities;

15 U.S.C.A. § 80b-2(a)(11) (emphasis added). Therefore, a person is an investment advisor subject to the IAA if they: (1) for compensation (2) engage in the business of advising others, either directly or through publications or writings, (3) as to the value of securities *or* as to the advisability of investing in, purchasing, or selling securities. *Id.* The four corners of the Engagement Letter and the CIM show that LBAM: (1) expected to be compensated; (2) advised Kestrel through the CIM; and (3) prepared a research document based on LBAM's claimed expertise as to the value of investing in life settlements as a part of the larger collateral hedge in their fundraising efforts. Bankr. R. Appendix 5, 382–83, ECF No. 6-3. And in the section titled "scope of service," the Engagement Letter states that LBAM will advise Kestrel "in structuring of the evaluation, acquisition, and ownership of the Life Settlements." *Id.* Therefore, assuming *arguendo* that life settlements are securities, LBAM is an "investment adviser" under the plain language of the IAA.

This conclusion finds support in *S&D Trading Academy, LLC v. AAFIS Inc.*, 336 F. App'x 443 (5th Cir. 2009). There the Fifth Circuit addressed an analogous factual situation where a school gave advice to students on how to invest in stocks. *S & D Trading Academy, LLC*, 336 F. App'x at 445. In addressing whether the teacher exception in the IAA applied to the school, the Fifth Circuit, invoking the general purpose of the IAA "to protect investors," concluded that the school

---

[3] LBAM was located in Minnesota and Kestrel was located in Texas, and neither party challenges that LBAM used emails and other means of interstate commerce. This controversy centers on whether LBAM was an investment advisor.

was an investment advisor and did not qualify for the teacher exception in the statute even though it never advised students to buy or sell securities or "commit funds to any kind of investment." *Id.* (citing an SEC no-action letter reasoning the same). Applying this same logic here, LBAM satisfies the IAA's definition of investment advisor even if neither it nor Kestrel ever purchased life settlements.

The bankruptcy court therefore correctly found that LBAM was an investment advisor under the IAA, provided LBAM's proposed investments in life settlements, as described in the CIM, qualify as securities under the IAA.

### B. Life Settlements as Securities Under the IAA

The Court will next consider whether life settlements constitute securities under the IAA. If so, then LBAM was an investment advisor, and LBAM's failure to register under the IAA makes its agreement with Kestrel in the Engagement Letter voidable.

Both parties agree that the meaning of "securities" in the IAA is governed by the Supreme Court's three-part test in *Howey*. In *Howey*, the Supreme Court held that to determine whether a contract, transaction, or scheme is an investment contract for purposes of the securities acts, "[t]he test is whether the scheme involves [1] an investment of money in [2] a common enterprise [3] with profits to come solely from the efforts of others." *Howey*, 328 U.S. at 301. LBAM argues that the bankruptcy court incorrectly concluded that the three prongs of *Howey* are met here because Kestrel did not invest money, no common enterprise existed, and Kestrel did not depend on LBAM for its expertise. Appellant's Br. 7, ECF No. 8. Kestrel responds that the bankruptcy court correctly applied *Howey*, and further, that the Eleventh Circuit and the Texas Supreme Court have already examined this issue and determined that life settlements are securities under *Howey*. Appellee's Br. 4, ECF No. 11. In *S.E.C. v. Mutual Benefits Corp.*, the Eleventh Circuit applied the *Howey* test

to the word "securities" in the Securities Act of 1934 and found that life settlements are "securities," particularly when the purchasers rely heavily on pre-purchase and post-purchase "efforts of the promoters in making investments in viatical settlement contracts profitable." 408 F.3d 737, 744 (11th Cir. 2005). The Texas Supreme Court arrived at the same conclusion, holding that, under *Howey*, the life settlements in that case were investment contracts, and thus securities, under the Texas Securities Act—an analogous statute to the IAA. *Life Partners, Inc. v. Arnold*, 464 S.W.3d 660, 682 (Tex. 2015).

The Supreme Court's test in *Howey* requires (1) an investment of money, (2) in a common enterprise, (3) with expectation of profits solely from the efforts of others. 328 US at 301. The Court begins with the first prong and finds that life settlements involve an investment of money. The CIM explicitly contemplated investment from Kestrel and third-party investors into life settlement portfolios. Bankr. R. 3062, ECF No. 6-12. These portfolios would act as collateral guarantees against the debt facility Kestrel planned to create in order to fund their proposed prototype. *Id.* LBAM gave advice in the CIM about the advisability of investing in life settlements. LBAM prepared the CIM to help Kestrel raise money, and both parties specifically contemplated the existence of investors and investment money, both from Kestrel and from third party investors. The first prong of *Howey* is satisfied here.

Regarding the second prong, in order to determine whether there is a common enterprise, the "critical inquiry is confined to whether the fortuity of the investments collectively is essentially dependent upon promoter expertise." *SEC v. Continental Commodities Corp.,* 497 F.2d 516, 522 (5th Cir. 1974). The Fifth Circuit standard "requires interdependence between the investors and the promoter, [but] it does not define that interdependence narrowly in terms of shared profits or losses." *Long v. Shultz Cattle Co.*, 881 F.2d 129, 140–41 (5th Cir. 1989). Instead, the necessary

interdependence may be demonstrated by the investors' collective reliance on the promoter's expertise even where the promoter receives only a flat fee[4] or commission rather than a share in the profits of the venture. *Id.*[5]

Here, the bankruptcy court correctly found that there is a common enterprise in this case. The fortuity of the investments here—that is, the life settlements—is essentially dependent upon LBAM's expertise. Bankr. R. 118, ECF No. 6-3. LBAM was responsible for identifying the life settlements, for conducting due diligence on them, and for assisting Kestrel if valuing them. Bankr. R. 1047–48, ECF No. 6-3. According to the Engagement Letter, LBAM would assist in finding a custodian, as well as other parties to help Kestrel administer the contemplated policies. *Id.* Finally, the bankruptcy court found that even though Kestrel had the duty to negotiate, the fact remained that Kestrel had no background in life settlements so Kestrel's negotiations would rely "heavily if not exclusively on LBAM." *Id.* Underwood's testimony at trial showed that he came to LBAM for the sole purpose of depending on their expertise. Additionally, LBAM's Freitag remarked that because of his special expertise in life settlements it was worth a million dollars just to be in the same room as him. Bankr. R. 1378, ECF No. 6-3. These facts amply demonstrate that the second prong is satisfied in this case.

Finally, under the third *Howey* prong, the Court must determine whether there was an expectation of profits solely from the efforts of others. It is axiomatic in federal securities law that

---

[4] LBAM would receive only a flat fee under the Engagement Letter, but if LBAM and Kestrel had obtained investors, the Engagement Letter required Kestrel to enter into the Origination Agreement with LBAM, which contemplated a 1.25% fee on every deal brokered by LBAM. Bankr. R. 2264, ECF No. 6-8.

[5] LBAM asks that the Court apply a new test designed for transactions with a single investor. However, there are two problems with this proposal. First, in the opinion denying *en banc* rehearing on this issue, the Fifth Circuit declined to revisit its common enterprise test even while acknowledging the criticism of its test. *Long v. Shultz Cattle Co., Inc.*, 896 F.2d 85, 87 (5th Cir. 1990) (denying *en banc* hearing). Second, and most importantly, this Court must follow precedent in *SEC v. Continental Commodities Corp.*, 497 F.2d 516, 522 (5th Cir. 1974) and *Long v. Shultz Cattle Co., Inc.*, 881 F.2d 129 (5th Cir. 1989), even if those cases are criticized or controversial.

in order to give effect to the remedial purposes of the Acts, substantive "economic realities" must govern over form. *See e.g., International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 558 (1979); *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852 (1975). Consequently, in order to ensure that promoters of securities investments do not easily circumvent the securities laws through agreements requiring a "modicum of effort," courts do not construe the word "solely" in the third prong of the *Howey* test literally. *Securities & Exchange Comm'n v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 480 (5th Cir.1974). The "critical inquiry" is instead "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Youmans v. Simon,* 791 F.2d 341, 345 (5th Cir.1986); *Williamson v. Tucker,* 645 F.2d 404, 418 (5th Cir. 1981); *Koscot*, 497 F.2d at 483 (quoting *Glenn W. Turner Enterprises,* 474 F.2d at 482).

LBAM argues in its appellate brief that: (1) Kestrel did not expect to derive profits from the efforts of LBAM because Kestrel was not obligated to invest in life settlements via LBAM; and (2) Kestrel would not have relied on LBAM's efforts to profit from life settlements. Appellant's Br. 16, ECF No. 8. But LBAM's Freitag admitted that if Kestrel had obtained the proper funding, the Engagement Letter would have required LBAM and Kestrel to enter into the Origination Agreement—obligating Kestrel to invest in life settlements via LBAM wherein Kestrel would have relied on LBAM's efforts to profit from life settlements. Bankr. R. 1383–84, ECF No. 6-3. LBAM also argues that "fractionalized" interests in life settlements are different from whole policies. Appellant's Br. 16, ECF No. 8. They attach the SEC Life Settlements Task Force's Report, dated July 22, 2010 (the "SEC Report") to their brief. This document states that to date the SEC has only brought cases involving the sale of fractionalized interests in life insurance policies, "it is unclear whether a federal court would hold the sale of a single insurance policy to

one investor would constitute an offer or sale of a security under the Securities Act." Appellant's Br. (Ex. B, SEC Report) 24, ECF No. 8. However, without further guidance from the Fifth Circuit or Supreme Court, this Court does not find this report persuasive. It is clear that Kestrel still depended on LBAM's vaunted expertise to identify which life settlements to include. LBAM offers only the SEC Report as evidence of the difference between whole settlements and fractionalized life settlements. This report merely observes the SEC has not brought a case like this and this area of the law is murky. LBAM's scantily supported argument merely shows there is a difference, without convincing the Court there is a distinction.

Finally, the Fifth Circuit noted in *Youmans* that "investors may still need the protection of federal securities laws even though they may have taken on minor duties as part of a common enterprise." 791 F.2d at 345–46. Here Kestrel took on managerial duties in the Engagement Letter and presented the CIM in investors meetings, and the bankruptcy court found through the evidence at trial that Kestrel would continue to rely on LBAM's expertise for the success of the venture. The Court holds, therefore, that the bankruptcy court correctly found that there was an expectation of profits in the life settlement investments envisioned by the Engagement Letter.

Because the bankruptcy court correctly found that the life settlements contemplated in the CIM qualify as securities under *Howey*, LBAM qualifies as an investment advisor who gave advice regarding the advisability of investing in securities and therefore should have registered under the IAA. LBAM appears to argue that life settlements are not securities because LBAM never purchased them—as if the being of a thing is established by the commercial exchange of it. LBAM's definition of "securities" in IAA, making its application to an instrument contingent upon whether LBAM trades in that instrument, recalls the hermeneutics of Humpty Dumpty: "When *I* use a word . . . it means just what I choose it to mean—neither more nor less."" LEWIS CARROLL,

THROUGH THE LOOKING GLASS, 205 (1934). But the IAA's definition of "securities" is not so malleable, and that singular definition of "securities" applies to financial instruments regardless whether they are the subject of a transaction or financial advice. The instrument LBAM prepared and offered to Kestrel contained a financial transaction that qualified as a security under *Howey*, therefore this Court **DISMISSES** the first two questions that LBAM brings on appeal.

### C. Use of Parol Evidence

LBAM's last objection to the bankruptcy court's final judgment is that it impermissibly used parol evidence to vary the terms of the Engagement Letter and/or the Origination Agreement. Appellant's Br. 44, ECF No. 8. The bankruptcy court acknowledged that it considered parol evidence in coming to its findings but concluded that LBAM was not prejudiced by the consideration of such evidence. Although LBAM claims that it was generally prejudiced due to the court's use of parol evidence, it points to no specific use of such evidence that tainted the bankruptcy courts findings of facts or conclusions of law. In order to state a valid appeal, the appellant must demonstrate that particular findings are clearly erroneous. The appellant may not ask the Court to review the entire record in a wholesale search for error, as LBAM does in its appeal. *In re Way Apartments, D.T*., 201 B.R. 444, 449 (N.D. Tex. 1996).

## VI. CONCLUSION

For the foregoing reasons the appeal is **DENIED** and the bankruptcy court's oral ruling and final judgment is hereby **AFFIRMED.**

**SO ORDERED** on this **26th day** of **March, 2018.**

_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**